NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0178n.06
Filed: March 13, 2006

Nos. 04-4326

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

WASTE MANAGEMENT OF OHIO, INC.,

    Plaintiff-Appellee,

v.

CITY OF DAYTON,

    Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

_____/

Before:      MERRITT, MARTIN, and GILMAN, Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge. This case concerns the location of certain buildings on landfill property in the City of Dayton, Ohio. The crux of the dispute is that Waste Management wants to construct its buildings on the southern side of the landfill property. The City argues that the buildings are required to be located on the western side of the landfill property.

Since 1991, this case has traveled down a long and winding road and sometimes, it seems, the wrong way down a one-way street. That notwithstanding, the district court's latest decision holds that a proper interpretation of PD-69, as incorporated into the parties' Consent Decree and Settlement Agreement, permits Waste Management to construct the buildings on the southern side of the landfill. Although we do not necessarily agree with all of the district court's analysis, we AFFIRM its decision.

**I.**

In May 1990, Waste Management applied for a change of zoning and in July 1990 applied for approval of a Planned Development (PD-69), for developing a 113 acre landfill and recycling center in Dayton, Ohio. In November 1990 the Dayton Plan Board denied the applications and in February 1991, the City Commission declined to overrule the Plan Board. Federal litigation began immediately thereafter and many of the following facts are taken from this Court's previous ruling in *Waste Management of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1143-44 (6th Cir. 1997) (*Waste Management I*).

> In February 1991 federal litigation ensued between WMO and the City regarding the latter's denial of WMO's request to rezone a large tract of land on the west side of Dayton (from single-family residential to industrial) in order for a sanitary landfill (the "Stony Hollow Landfill") to be operated thereon. WMO and the City entered into a settlement agreement on April 15, 1992 (the "Settlement Agreement"), which resolved the lawsuit, provided for construction of the Stony Hollow Landfill, and incorporated the Planned Development for Stony Hollow ("revised PD-69" or "PD-69"). This Settlement Agreement was, in turn, incorporated into a consent decree entered and approved by the district judge on April 16, 1992 (the "Consent Decree").
>
> Two years after the judicial entry of the Consent Decree and the City's subsequent approval of the rezoning, as part of the process of obtaining final permits required for the construction of the Stony Hollow Landfill, WMO submitted an Overall Site Plan containing specific design and construction requirements to the Ohio EPA with a copy to the City. In a letter dated March 15, 1994 from Paul Woodie, Director of Planning for the City, to WMO, the City pointed to four areas in which there existed a discrepancy between the Overall Site Plan and PD-69, the fourth being the relocation of buildings and support facilities from the west side to the south side. The letter further stated, however, with respect to the fourth item only, "it appears that the new arrangement does meet the intent and provisions of PD-69" and that "[t]he change in access drives, building locations and support facilities as shown ⋯ is in substantial compliance with PD-69." WMO and the City differ as to the meaning and legal significance of this statement as it relates to the relocation issue. This difference in perception became apparent when WMO sought permission to fill a ravine in order to bring the southern area up to grade in preparation for the building construction and to alter slightly the buildings' location on the south side, and the City responded that it had never approved the relocation in the first place. WMO

then proceeded under the Dayton Zoning Code § 150.289 to seek approval for the relocation. Woodie and Michael Cromartie, the Superintendent of Building Inspection for Dayton, were proposing to approve the change, unless a majority of the City Commission were to direct them to do otherwise. Yet, on April 27, 1995 WMO's Division President, Robert Downing, Jr., was notified that Woodie and Cromartie had decided to reject the requested relocation.

When the City filed a motion for an order releasing certain funds that had been placed in escrow pending resolution of other disputes between WMO and the City, WMO objected, claiming that the City had breached the Settlement Agreement and Consent Decree by changing its position regarding the location of the Stony Hollow Landfill buildings when it was estopped from doing so. On July 26, 1996 the district court ordered the release of the escrowed funds upon deciding that it only had subject matter jurisdiction to determine "whether [the] Settlement Agreement and the Consent Decree permit WM [O] to locate the buildings on the south side" and could not address the impact of any state law claims in answering this question. The scope of the district court's subject matter jurisdiction over this dispute is the narrow issue now on appeal before this court.

*Waste Management I*, 132 F.3d at 1143-44 (internal citations and footnotes omitted).

This Court previously framed the underlying dispute as "whether the City, by virtue of its post-settlement actions, is estopped from refusing to approve WMO's construction of buildings on the south side of a landfill property, instead of the west side as originally designated in a consent decree between the parties." *Id.* at 1143. The district court had held that it did not have jurisdiction to entertain the estoppel argument. This Court reversed and held that the district court did have subject matter jurisdiction over the dispute, stating that "[*w*]*ithout reaching the merits* of the underlying cause of action or giving any opinions as to whether WMO has presented new factual considerations or events which have rendered the strict enforcement of a consent decree so inequitable that a modification would be justified, this court concludes that the district court does possess the subject matter jurisdiction to address such an issue." *Id.* at 1146 (emphasis added). So concluding, this Court "REMANDED for further proceedings consistent with this opinion." *Id.*

On remand, on March 29, 1999, the district court noted that the Montgomery County Court of Appeals issued a decision holding that PD-69 was invalid and void. JA 321 (citing *Brown v. City of Dayton*, 1998 WL 852636 (Ohio App. 1998)). Thus, the district court "overrule[d], without prejudice to renewal . . . WMO's Motion for Clarification of, in the alternative, for Modification of the Consent Decree," and held that if *Brown* was appealed to the Ohio Supreme Court and reversed, Waste Management could renew its motion within twenty days of that decision. In 2000, the Ohio Supreme Court reversed *Brown*, finding that PD-69 was valid. *Brown v. City of Dayton*, 730 N.E. 2d 958 (2000)). Waste Management renewed its motion and the district court heard arguments and issued a decision on September 20, 2004. In its decision, the district court reversed its earlier decision and held that "the only reasonable interpretation of the Consent Decree, Settlement Agreement and PD-69 is that it (WMO) is permitted to locate the buildings on the south side of the property."

Prior to its decision (issued September 20, 2004), the district court held an evidentiary hearing (on March 8, 2000), and received testimony from James Logsdon on behalf of Waste Management about the negotiations between Waste Management and the City leading to the Settlement Agreement. *Id.* at 7. Logsdon testified that as part of the negotiations, he provided a revised site plan showing the buildings located on the south side of the landfill. *Id.* at 8. The original site plan showed the buildings on the west side. *Id.* Part of the negotiations focused on reducing the setback — the area between trash and any other uses for the land — from 300 to 150 feet. *Id.* Logsdon testified that he pointed out to City negotiators that in order for Waste Management to get the benefit of the reduced setback — less setback area means more trash and

more money for Waste Management — the buildings would have to be located on the south side of the landfill. *Id.* According to the district court, "Logsdon testified that there was never a discussion about leaving the buildings on the west side of the land fill and requiring the outer limit of waste to curve around them; rather, the negotiators for the City of Dayton agreed that the buildings could be located on the south side of the property." *Id.* at 8-9.

The City argued that res judicata and law of the case precluded the district court from revisiting the issue of the proper interpretation of the Settlement Agreement and that the district court was limited to addressing Waste Management's estoppel argument. Finding that revisiting the issue would be part of the "same proceeding" as the 1996 decision, and not revisiting a claim decided in an earlier lawsuit in a later subsequent lawsuit, the district court held that res judicata did not apply. *Id.* at 9. The district court devoted more attention to the City's argument that the court could not revisit the issue based on the law of the case doctrine, but rejected that claim as well. The court concluded that the doctrine does not prevent a court from revisiting issues it previously decided in the same litigation and therefore it had discretion to revisit the claim. *Id.* at 10. The district court did not address the impact, if any, of this Court's decision in *Waste Management I*, on its power to revisit the issue.

In the process of its reconsideration, the court determined that it was appropriate to look to extrinsic evidence, and found that to require the buildings to be on the west side would "contravene the parties' intent, as expressed by their negotiations and would deprive WMO of a significant benefit it derived from settling this litigation." *Id.* at 18. Thus, the district court concluded that "the

only reasonable interpretation of the Consent Decree, Settlement Agreement and PD-69 is that

WMO is permitted to locate the buildings on the south side of Stony Hollow." *Id.*

The district court then addressed Waste Management's estoppel argument and found "no

evidence that WMO relied to its detriment upon the statement of Woodie in his letter concerning the

location of the buildings," and therefore rejected the claim. *Id.* at 20-22.

The City now appeals, arguing that (1) claim preclusion prevents the district court from

revisiting the issue; (2) the law of the case doctrine prevents the district court from revisiting the

issue; (3) the district court's decision conflicts with the City's charter; and (4) even if the court could

revisit the issue, it erred by considering extrinsic evidence.

**II.**

A.     *The District Court's Prior Decisions*

i.     *The 1995 Decision*

On March 30, 1995, the district court issued its "Decision and Entry Sustaining Motion of

Plaintiff Waste Management of Ohio, Inc. for Clarification of Agreed Consent Decree and

Sustaining in Part and Overruling in Part Said Plaintiff's Motion for Supplemental Relief Pursuant

to the Settlement Agreement." Waste Management filed the motion for clarification because of a

dispute over the dimensions of the landfill and asked the court to interpret and clarify the Consent

Decree and Settlement Agreement. JA 153-54 ("Indeed . . . this Court specifically stated that its

purpose was to help the parties clarify the Consent Decree and not to modify it."). The court

conducted an oral and evidentiary hearing. Specifically at issue in this 1995 decision was a dispute

over the situs of the landfill, its final slope and its final maximum height above sea level.

Waste Management argued that the site plan "was not more than a conceptual drawing, which did not purport to set final dimensions for the landfill," and also that PD-69, "as incorporated into the Settlement Agreement and adopted" by the City did not mention a final, maximum height or final grading slope. The district court reviewed the evidence, including James Logsdon's affidavit, and found that the Consent Decree and Settlement Agreement do not expressly mention either of the dimensions for the landfill. Nevertheless, the court found that "the Settlement Agreement does provide that WMI shall construct the landfill in accordance with revised PD-69, and, under revised PD-69, WMI agreed that all dimensions on the approved plan shall be binding upon it." The court then found that when the City approved the Settlement Agreement, the only plan before it was "the plan which WMI submitted to Dayton on August 1, 1990, and to which Dayton's staff added a legend and the text of revised PD-69." Finding that this plan was the "approved plan," the court concluded that the dimensions in the plan were binding on Waste Management.

Waste Management continued to argue that the parties did not expect the final dimensions to be determined prior to the involvement of the Ohio Environmental Protection Agency. The district court found, however, that "there is no language in the Consent Decree, Settlement Agreement or revised PD-69 which would give either WMI or the Ohio EPA the right to alter the dimensions of the landfill." The court further rejected Waste Management's claim that "its original design of the landfill was dynamic, conceptual only and subject to change, and that, therefore, the dimensions for final, maximum height and slope . . . are not binding." Moreover, "[t]here is no language in the Consent Decree, Settlement Agreement or revised PD-69 which would provide for the design of a landfill subject to later alteration by a body other than the Dayton City Commission."

Accordingly, "[t]he Settlement Agreement quite unambiguously provides that the dimensions on the approved plan shall be binding" on Waste Management.

### ii.      The 1996 Decision

The dispute in 1996 involved the "location of certain buildings[, parking lots, and wheel washing facilities] on the landfill property." *See* Opinion Setting Forth Decision on Unresolved Dispute; WMI Ordered to Pay Escrowed Funds to Dayton.  To start, the district court referenced its 1995 decision where it interpreted the Settlement Agreement to require Waste Management to comply with all the terms and conditions of revised PD-69.  Revised PD-69 specifically provided that: "All dimensions on approved plan shall be binding, and the appropriate scale be used to interpret where dimensions are lacking, unless modified as per Section 150.289 of the R.C.G.O."

Based on the 1994 Letter from Paul Woodie, Waste Management argued that the City was now estopped from preventing Waste Management from moving the buildings to the south side of the landfill.  The district court concluded that it did not have jurisdiction to hear the estoppel claim. It found that "this Court's jurisdiction is limited to the question of whether [the] Settlement Agreement and the Consent Decree permit WMI to locate the buildings on the south side of the property, rather than on the western edge, as was disclosed by the initial site plan which accompanied Revised PD-69."  Regarding the interpretation issue, the court found that "the initial site plan shows that the buildings will be located on the <u>western</u> side of the property."  The court continued:

> Although the text of Revised PD-69 does not address the location of the buildings, it expressly states that "parking shall be located in the area depicted on the site plan

> . . . ." Parking is an integral part of the buildings in question. Given the fact that this Court has concluded that the initial site plan is binding on the parties and the additional fact that Revised PD-69 states that parking (parking which is integral to the buildings) shall be located in the area depicted on that plan, this Court cannot conclude that Dayton violated the Settlement Agreement or the Consent Decree by denying the requested minor adjustments. In short, the initial site plan cannot be deemed binding on one issue [the height and slope issues from the 1995 decision] and not on another [the buildings]."
>
> In sum, this Court, in its decision of March 30, 1995, held that the site plan which accompanied Revised Pd-69 is binding on the parties. *That site plan reveals that the buildings would be located on the western side of the landfill; therefore, the parties agreed, in the Settlement Agreement and the Consent Decree, that the buildings would be located on that side of the landfill.*

(internal citations omitted and emphasis added). The court, as previously mentioned, did not address Waste Management's estoppel argument because it concluded that it lacked jurisdiction to do so.

B.      Waste Management I — *The First Appeal to the Sixth Circuit*

After the district court's 1995 and 1996 decisions holding that the Settlement Agreement required the buildings to be placed on the western side of the property but that it did not have jurisdiction to hear Waste Management's estoppel argument, Waste Management pursued an interlocutory appeal to this Court. *See Waste Management I*, 132 F.3d 1142. The *only* issue appealed by Waste Management was whether the district court erred by concluding that it lacked jurisdiction to address the estoppel argument. *Id.* at 1143, 1144 ("WMO claims that the district court does possess subject matter jurisdiction over the buildings relocation issue even as it may implicate post-settlement actions by the City, the equitable principle of estoppel, and WMO's ability to obtain approval for the relocation through a procedure provided for under the city zoning code."). Early in this Court's opinion, it noted that the district court's 1995 "decision and order was not appealed by Waste Management and is not a subject of this appeal." *Id.* at 1144 n.1.

This Court framed the issue narrowly as "whether the City, by virtue of its post-settlement actions, is estopped from refusing to approve WMO's construction of buildings on the south side of a landfill property, instead of the west side as originally designated in a consent decree between the parties"); *id*. at 1146 (consistently referring to Waste Management's claim as one for *modification* of the terms rather than interpretation of their meaning). In doing so, it recognized that at the district court level, Waste Management argued that the Settlement Agreement permitted the buildings to be placed on the south side or, in the alternative, the City was estopped from protesting their placement on the south side, but that on appeal, Waste Management argued only the estoppel issue. *Id.* at 1145. Furthermore, this Court's closing statement — not expressing any opinion on whether "new factual considerations or events [] have rendered the strict enforcement of a consent decree so inequitable that a modification would be justified," *id.* at 1146 — demonstrates that the Court was not addressing the underlying merits of the case.

Judge Jones concurred and wrote separately and stated that:

> I concur in the result reached by my colleague that a district court has subject matter jurisdiction to determine whether changed circumstances have altered the obligations of parties to a consent decree. I write separately to emphasize that this general statement of law does not grant courts and parties who have formerly agreed upon the terms of a consent decree, the ability to tamper with its express provisions absent clear proof of a significant change of factual circumstances that either: 1) make compliance with the decree substantial more onerous, or 2) when a decree proves to be unworkable because of unforseen obstacles, or 3) when enforcement of the decree without modification would be detrimental to the public interest.

*Id.* at 1147 (Jones, J., concurring) (citing *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013 (6th Cir. 1994)). Also in his concurring opinion, Judge Jones noted that Waste Management did not seek a modification based on "changed circumstances," but rather relied entirely on the theory of

estoppel based on Paul Woodie's 1994 Letter. *Id.* at 1147. Judge Jones further noted that "WMO's request does not entail a clarification, interpretation or enforcement of the Consent Decree because the court below already determined that WMO was bound by the terms of PD-69 (which specified the location of the buildings at issue)." *Id.* Finally, Judge Jones wrote that "the district court does have subject matter jurisdiction in this case, to decide the narrow issue of whether changed circumstances have altered WMO's obligation under the Consent Decree. I, however, emphasize that in order to justify a modification in this case, WMO must allege and prove much more than mere equitable estoppel under Ohio state law." *Id.*

C.      *The Remand*

On remand, as already discussed above, the district court addressed and rejected Waste Management's estoppel argument. The court, however, revisited its decision regarding the location of the buildings based upon the proper interpretion of the Consent Decree and Settlement Agreement, and reversed its earlier decision. Consequently, the court held that, contrary to its 1995 and 1996 rulings, the Settlement Agreement permitted Waste Management to place the buildings on the south side of the property. The court rejected the City's arguments that claim preclusion and the doctrine of law of the case prevented such a revisiting of the issues. The City now appeals.

**III.**

A.      *Claim Preclusion*

The district court correctly determined that the doctrine of claim preclusion did not prevent it from revisiting the issue of the location of the buildings. Claim preclusion reflects "a fundamental

precept of common-law adjudication [] that an issue once determined by a competent court is conclusive." *Arizona v. California*, 460 U.S. 605, 619 (1983) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)). "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana*, 440 U.S. at 153-54; *see also Southern Pacific R. Co. v. United States*, 168 U.S. 1, 49 (1897) (discussing need for finality "to secure the peace and repose of society by the settlement of matters capable of judicial determination"); *Rezzonico v. H&R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999) (res judicata rests on "policy considerations favoring putting an end to litigation, saving judicial time, and bringing certainty to legal relations"); *Moore's Federal Practice* § 131.10[1][a] (3d ed. 2005) (finality necessary for "other judicial concerns, such as fairness to the parties, fostering respect for and reliance upon court judgments and reducing over-crowded court dockets"). Specifically, "[a]fter a final judgment on the merits rendered by a court of competent jurisdiction, *res judicata* bars subsequent litigation between the same parties and those in privity with them involving the same cause of action." *Rezzonico*, 182 F.3d at 148. "If subsequent litigation arises from the same cause of action, both those matters actually offered to sustain the claim and those that might have been offered in the prior action are barred from being relitigated; that is, there is claim preclusion." *Id.*

Moore's Federal Practice states that claim preclusion "prevents a party from suing on a claim which has been previously litigated to a final judgment by that party or such party's privies and precludes the assertion by such parties of any legal theory, cause of action, or defense which could

have been asserted in that action." *Moore's Federal Practice* § 131.10[1][a] (3d ed. 2005). Thus, for a party to invoke claim preclusion, there must be a final judgment and a *subsequent* litigation. That is, "[r]es judicata does not speak to direct attacks in the same case, but rather has application in subsequent actions." *Id.*

There is some intuitive appeal to applying claim preclusion in this case, but it would be inappropriate to do so.[1] Although the district court issued several decisions between 1992 and 2004, the relevant decision for purposes of this case is the district court's 1996 decision.[2] In its 1996 decision, the district court held that the Settlement Agreement required the buildings on the west side of the property, but that it did not have jurisdiction to review Waste Management's estoppel claim. Waste Management appealed the jurisdiction issue and this Court reversed and remanded. On remand, the district court revisited its conclusion regarding the Settlement Agreement and also

---

[1]Claim preclusion is likewise "not concerned with whether a prior judgment was right or wrong or whether subsequent changes in the law, the discovery of additional facts, or considerations of fairness should merit a different result in the subsequent litigation. It is concerned only with bringing an end to litigation after the parties have had a fair opportunity to litigate their claims." *Moore's Federal Practice* § 131.12[3] (3d ed. 2005).

[2]The City seems to argue that the March 1995 decision is the relevant decision that provides the claim preclusion. We disagree. Waste Management filed its Motion for Clarification of the Consent Decree on May 31, 1994. A few months earlier, on March 15, 1994, Waste Management had learned from Paul Woodie, that the buildings could be located on the south side. Thus, at the time they filed their motion for clarification, there was apparently no dispute regarding the location of the buildings. The district court issued its decision holding that the Settlement Agreement provided that revised PD-69 was binding on the parties on March 30, 1995. It was not until April 27, 1995 that the City notified Waste Management that it did not have approval to move the buildings. Furthermore, the court's 1995 decision does not specifically address the buildings and the court heard no evidence regarding their location. Thus, the 1996 decision is the relevant decision for this Court's analysis.

addressed, and rejected, Waste Management's estoppel argument. Pursuant to this scenario, there was no final judgment regarding the 1996 decision and claim preclusion does not apply.

B.      *Law of the Case Doctrine*

The doctrine of law of the case is similar to claim and issue preclusion in that it limits the relitigation of issues once they have been decided. *See e.g.*, *Arizona v. California*, 460 U.S. 605, 618 (1983) ("As most commonly defined, the doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should [generally] continue to govern the same issues in subsequent stages in the same litigation."). The difference between preclusion and law of the case is that "law of the case is concerned with the extent to which law applied in a decision at one stage of litigation becomes the governing principle in later stages of the same litigation." *Rezzonico*, 182 F.3d at 148 (noting that claim preclusion has application in subsequent actions while law of the case applies to subsequent stages of the same litigation); *see also Moore's Federal Practice* § 134.20[1] (3d ed. 2005). Thus, "when a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995).

The doctrine, like preclusion, promotes efficiency and finality. *Moore's Federal Practice* § 134.20[2] (3d ed. 2005); *see also McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000) ("The enunciated rationales for the law of the case doctrine are compelling: The doctrine is based on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided.").

The doctrine further encourages litigants to present "all available claims and defenses at the earliest opportunity." *McIlravy*, 204 F.3d at 1035. To that end, "[t]he law-of-the-case doctrine is rigidly applied to enforce a lower court's obedience to a higher court; however, the doctrine is more flexibly applied to reconsideration of earlier decisions by the same court or a coordinate court." *United States v. Dunbar*, 357 F.3d 582, 592 (6th Cir. 2004) (citing *Gillig v. Advanced Cardiovascular Sys.*, 67 F.3d 586, 589 (6th Cir. 1995)).

Thus, law of the case is more appropriately characterized as a "management practice" at the trial court level and prejudgment orders can be reconsidered without restriction. *Dubar*, 357 F.3d at 592-93 ("We have previously refused to apply the law-of-the-case doctrine to preclude review of various prejudgment rulings."); *Gillig*, 67 F.3d at 590 ("The doctrine of law of the case, therefore, does not foreclose a court from reconsidering issues in a case previously decided by the same court."); *see also Moore's Federal Practice* § 134.20 (3d ed. 2005). Although the doctrine does not foreclose a district court's reconsideration of its prejudgment orders, "it does cast an air of caution on such an exercise by a judicial officer." *Gillig*, 67 F.3d at 589-90. In *Gillig*, this Court quoted *Moore's Federal Practice* that: "It would be utterly destructive . . . if each successive decision resulted in the reconsideration of every previous one, and a sequence of decisions in the same case based on different views of overlapping issues of law would likely result in an internally inconsistent judgment. To avoid the horns of this dilemma, it is the practice to treat each successive decision as establishing the law of the case and depart from it only for convincing reasons." *See also Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("A court has the power to

revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule

courts should be loathe to do so in the absence of extraordinary circumstances.").

As noted above, although the same court may revisit issues previously decided by it, this is

not true when an appellate court has determined an issue of law. When a superior court determines

the law of the case and issues its mandate, a lower court is not free to depart from it. *Litman v.*

*Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506 (11th Cir. 1987). The mandate rule is a specific

application of the law of the case doctrine. *Scott v. Churchill*, 377 F.3d 565, 570 (6th Cir. 2003).

"The basic tenet of the mandate rule is that a district court is bound to the scope of the remand issued

by the court of appeals." *Id*. "In determining whether the district court violated the law of the case

doctrine or the mandate rule, we must consider: a) whether the [] issue was expressly or impliedly

decided by this court in [the first appeal], and b) whether this court's mandate to the district court

was so narrow in scope as to preclude the district court from considering the [] issue." *United States*

*v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994); *see also United States v. Kikumura*, 947 F.2d 72, 76

(3d Cir. 1991) (citations omitted) ("Upon remand of a case for further proceedings after a decision

by the appellate court, the trial court must proceed in accordance with the mandate and the law of

the case as established on appeal. The trial court must implement both the letter and the spirit of the

mandate, taking into account the appellate court's opinion and the circumstances it embraces.").

When an appellate court determines the law of the case, it may do so either *explicitly* or by

*implication*. *See e.g.*, *Griffin v. Mich. Dep't of Corrections*, 5 F.3d 186, 190 (6th Cir. 1993); *Rishell*

*v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407, 1410 (10th Cir. 1996) ("[L]aw of the case

applies to issues that are resolved implicitly as well as to those decided explicitly."); *Kansas Pub.*

*Employees Retirement Sys. v. Blackwell, Sanders, Matheny, Weary & Lombardi, L.C.*, 114 F.3d 679, 687 (8th Cir. 1997); *Alberti v. Klevenhagen*, 46 F.3d 1347, 1351 n.1 (5th Cir. 1995); *Day v. Moscow*, 955 F.2d 807, 812 (2d Cir. 1992); *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991); *Liberty Mut. Ins. Co. v. EEOC*, 691 F.2d 438, 441 (9th Cir. 1982); *Walston v. School Bd. of Suffolk*, 566 F.2d 1201, 1205 (4th Cir. 1977)). "Under the law of the case doctrine, there are several circumstances under which an issue may be implicitly resolved by a prior appeal." *McIlravy*, 204 F.3d at 1036. The non-exhaustive list includes: "(1) resolution of the issue was a necessary step in resolving the earlier appeal; (2) resolution of the issue would abrogate the prior decision and so must have been considered in the prior appeal; and (3) the issue is so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated." *Id.* (quoting *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 707 (10th Cir. 1993), *modified on other grounds sub nom. Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 39 F.3d 1078 (10th Cir. 1994) (en banc)).

Additionally, "[t]he doctrine also bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not." *Rouse v. Daimler Chrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002) (citing *United States v. Adesida*, 129 F.3d 846, 849-50 (6th Cir. 1997). As this Court stated in *Adesida*, "[a] party who could have sought review of an issue or a ruling during a prior appeal is deemed to have waived the right to challenge that decision thereafter, for '[i]t would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost.'" *Adesida*, 129 F.3d at 850 (quoting *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981). To

conclude otherwise would also undermine both efficiency and finality and may render appellate courts susceptible to piece-meal appeals.

Although the doctrine of the law of the case is enforced quite rigidly to ensure obedience of a lower court to a higher court's decisions, *see Bowling v. Pfizer, Inc.*, 132 F.3d 1147, 1150 (6th Cir. 1996), there are "exceptionally narrow" grounds for departure from this general rule.  *See United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998).  These narrow grounds are: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice."  *McIlravy*, 204 F.3d at 1035 (citing *Alvarez*, 142 F.3d at 1247); *Coal Resources, Inc. v. Gulf & W. Indus.*, 865 F.2d 761, 766-67 (6th Cir. 1989) (reconsideration of the law of the case may occur when "the evidence in a subsequent trial was substantially different; controlling authority has since made a contrary decision of law applicable to such issues; or the decision was clearly erroneous, and would work a substantial injustice").

To recap, in 1996, the district court specifically held that the Settlement Agreement and Consent Decree required the buildings to be located on the west side of the landfill, but that it did not have jurisdiction to consider Waste Management's estoppel argument based on the City's *post-settlement* conduct.  The case was then appealed to this Court.  Waste Management challenged the district court's holding on the estoppel issue.  *Waste Management I*, 132 F.3d at 1143-44.  Consistently throughout the opinion, this Court characterized the claim as one for *modification* of the Settlement Agreement, *not* for interpretation or clarification.  At no time, however, was the issue

of the interpretation of the Settlement Agreement before this Court.  The panel, in a narrow decision,

did not address it nor did this Court consider the underlying merits of the case.  This Court merely

decided a jurisdictional issue and remanded for further consideration.  Because the issue of the

interpretation of the Settlement Agreement was not before this Court and this Court decided only

a very narrow jurisdictional question, the law of the case doctrine and the mandate rule,[3] did not

preclude the district court from reconsidering its decision.  Although this Court may have assumed

certain facts in reaching its decision, it did not implicitly decide or consider, under principles of

contract interpretation, the Settlement Agreement. Where the ruling in question was not made by

a higher court, the decision to reconsider the prior determination is subject to review under an

"abuse of discretion" standard.  *See Bowling*, 132 F.3d at 1150; *Pacific Employers Ins. Co. v. Sav-A-

Lot of Winchester*, 291 F.3d 392, 399 (6th Cir. 2002).

The court below provided three reasons for its decision to revisit the issues.  The first was

that its 1996 decision was made in a "decidedly different context and was based upon different

evidence."  The district court's second reason for addressing the issues was that "in arguing that it

should be permitted to construct the buildings on the south side of the property, WMO previously

---

[3]There are limited exceptions to the mandate rule that are the same as the exceptions to the law of the case doctrine as a whole.  "Even where, as here, an appellate court's mandate does not contemplate resurrecting an issue on remand, the trial court may still possess some limited discretion to reopen the issue is very special circumstances."  *United States v. Bell*, 988 F.2d 247, 250-51 (1st Cir. 1993).  Because the mandate rule is simply a specific application of the law of the case doctrine, this Court has noted that the exceptions remain the same.  In *Petition of United States Steel Corp.*, 479 F.2d 489, 494 (6th Cir. 1973), this Court explained that the exceptions to the rules are where there is "substantially different evidence raised on a subsequent trial; a subsequent contrary view of the law by the controlling authority; or a clearly erroneous decision which would work a manifest injustice."

focused upon the question of whether Dayton was estopped from arguing that the building[s] should be located on the western side of the property." Moreover, the court stated that "the parties did not present evidence, similar to Logsdon's testimony, concerning the negotiations that preceded the settlement of this litigation." The district court's third reason was that its "previous Decision addressing the location of the buildings was reversed by the Sixth Circuit . . . [and] that court stressed that equitable factors can be considered when related to a District Court's interpretation of a consent decree."

Without accepting all of the district court's analysis as to why it could reconsider its prior holding and while noting that it is a close case, we do not find that the district court abused its discretion in revisiting the issue of the location of the buildings. District courts should be extremely cautious in deciding whether to reconsider issues such as those in this case and should only do so sparingly. When an appellate court has not intervened and established the law of the case, the power to revisit such issues is within the district court's discretion so long as it does not abuse that discretion. In those circumstances, the decision to revisit an issue is a part of the district court's management practices. Though we may not always find these decisions wise, we reverse only if the court abuses its discretion. We find no such abuse here.

C.      *The District Court Did Not Err In its Interpretation of the Consent Decree*

A district court's interpretation of a consent decree is reviewed de novo and the underlying factual findings are reviewed for clear error. *Huguley v. General Motors Corp.*, 67 F.3d 129, 132 (6th Cir. 1995). We have applied a "deferential de novo" standard of reviewing when interpreting a consent decree on appeal from a district court that oversaw and approved the agreement. *Sault Ste.*

*Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371-72 (6th Cir. 1998); *see also Brown v. Neeb*, 644 F.2d 551, 558 n.12 (6th Cir. 1981) ("Few persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it."). This does not mean that we simply defer to the district court's interpretation, but rather utilize the lower court's understanding as "an additional tool for contract interpretation." *Sault Ste. Marie Tribe*, 146 F.3d at 371 (quoting *Huguley*, 52 F.3d at 1369-70).

Consent decrees are binding contracts, and the interpretation of them is a question of contractual interpretation. *Sault Ste. Marie Tribe*, 146 F.3d at 372; *Marshall v. Beach*, 758 N.E. 2d 247, 250 (Ohio 2001) (holding that in Ohio, a settlement agreement is considered a binding contract subject to the essential requirements of contract law). The Ohio Supreme Court has held that extrinsic evidence surrounding a contract may only be considered when the language of the contract is unclear or ambiguous or when the circumstances surrounding the agreement invest the language of the contract with a special meaning. *Shifrin v. Forest City Enters., Inc.*, 597 N.E. 2d 499, 501 (Ohio 1992). We agree with the district court that neither the Consent Decree nor the Settlement Agreement unambiguously determines where the buildings must be located on the landfill property. In fact, no document expressly states where the buildings are to be located. Thus, because the documents are ambiguous, the district court properly considered extrinsic evidence. We further find no error in the district court's consideration of the extrinsic evidence in order to determine the parties' intent. *See U.S. Fidelity & Guaranty Co. v. St. Elizabeth Med. Ctr.*, 716 N.E. 2d 1201, 1208 (Ohio Ct. App. 1998) (noting that proper consideration of extrinsic evidence may include: "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the

parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement"). Finally, we find no error in the district court's interpretation of the agreements and the extrinsic evidence, and its ultimate conclusion that the agreements permit Waste Management to locate the buildings on the southern side of the landfill.

## IV.

Waste Management has also asserted that the City is equitably estopped from challenging the location of the buildings and claims that we may affirm on these grounds despite the district court's rejection of the argument. In its reply brief, the City argues that based upon *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1992), Waste Management has waived its right to argue this issue by failing to file a cross-appeal. "Absent a cross-appeal, an appellee may urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court, but may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." *Id; see also Helvering v. Pfeiffer,* 302 U.S. 247, 250-251 (1937) ("[A]n appellee cannot without a cross-appeal attack a judgment entered below."). The prevailing party below, Waste Management, may defend a judgment on any ground, including grounds rejected by the district court or not even relied upon. This is true, so long as the party seeks to preserve and not modify the ultimate judgment — in this case, that the buildings could be located on the south side. *See El Paso Nat. Gas Co.*, 526 U.S. at 479. Thus, we would not be precluded from addressing estoppel as an alternative ground for affirmance. Because of our

holding above, however, it is unnecessary to address the argument. We do so, however, in response to our concurring colleague's opinion.

First, the district court rejected Waste Management's estoppel argument and found no detrimental reliance. Whether Waste Management detrimentally relied on Woodie's assertions is a factual determination reversible only if clearly erroneous. The district court found no indication that Waste Management would have expended funds differently if required to build on the west side. In short, Waste Management had to construct buildings somewhere and it had to spend money to do so. As the district court held, there is no indication that the expenditures in so-called reliance on Woodie's letter resulted from the letter's suggestion that the buildings could be located on the south side as opposed to anywhere else on the property.

Second, even though Woodie's letter stated that it appeared that moving the buildings to the south side was in substantial compliance with PD-69, the letter also noted that the parties were not in agreement on the terms of the setback, height, and slope. All three of these issues would implicate the precise location of the buildings. These issues being unresolved, weighs against the argument that Waste Management's reliance was reasonable at that point in time.

Third, because the district court found no evidence of reliance, it did not address whether any purported reliance would have been reasonable. Even assuming that Waste Management relied upon Woodie's letter, we do not believe this assumed reliance would have been reasonable. Waste Management may have been hopeful that Woodie was the final word on all issues, but we cannot ignore the fact that the Consent Decree specifically refers to Dayton Zoning Code section 150.289 as the mechanism for modifying dimensions specified in PD-69. Perhaps Woodie's letter could have

been more specific and stated that it was merely his belief that the new location was in substantial compliance, but of course, any changes must be approved by the City Plan Board. It did not, but Waste Management cannot claim ignorance with respect to the proper procedures for any modifications to PD-69. Thus, even assuming that Waste Management made expenditures in reliance upon the letter, we do not believe it would have been reasonable for the City to rely on Woodie's representations in this instance.

Fourth, the majority in *Waste Management I* noted that "the real question before this court is whether a claim that estoppel has altered a party's obligations and duties under a consent decree should be considered an issue concerning *the terms and conditions of the Settlement Agreement and Consent Decree*." *Waste Management I*, 132 F.3d at 1145 (emphasis in original). In essence, the issue was whether equitable factors can be considered resulting in a modification of a consent decree. Thus, unlike ordinary cases in which estoppel arises, Waste Management must overcome two tiers of analysis — first, whether equitable estoppel is established, and second, whether the equitable considerations are sufficient to require modification of a consent decree. As Judge Jones noted in his concurring opinion in *Waste Management I*, modification of a consent decree requires more than proof of "mere equitable estoppel under Ohio state law." *Id.* (citations omitted). "Modification of a consent decree is an extraordinary remedy that should not be undertaken lightly," and "the standard that must be met is clearly a high one." *Id.* Further, "[t]raditionally, courts have [ ]considered the modification of a consent decree to be serious, leading to 'perhaps irreparable' consequences.... As a contract, a decree ... reflects a compromise or agreement negotiated *between parties* who each have a purpose. Judicial approval of a settlement agreement places the power and

prestige of the court *behind the compromise struck by the parties*. The standard for justifying the modification of a decree is a *strict* one and a consent decree is, after all, a judgment entitled to a presumption of finality." *United States v. Wayne County, Michigan*, 369 F.3d 508, 511-12 (6th Cir. 2004) (citing *United States v. Michigan*, 940 F.2d 143, 150 (6th Cir.1991) (internal citations and quotations omitted)). Judge Jones also chastised Waste Management for attempting to "bypass the rigorous standard applied when a party seeks to modify a consent decree and focusing entirely on the Ohio state law of equitable estoppel," though it does not appear to us that Waste Management heeded his advise below. Thus, even if we assumed that equitable estoppel was established, that would not be the end of the inquiry entitling Waste Management to place the buildings on the south side. It would still need to meet the elevated standard for modifying a consent decree. Thus, like the district court, we reject equitable estoppel as an alternative ground for affirmance. Nevertheless, we affirm the district court's decision holding that Waste Management may locate the buildings on the south side of the landfill.

## V.

Litigation is sometimes the best and most efficient way to settle disputes. Fifteen years of litigation *after* a Consent Decree and Settlement Agreement was entered into, however, leaves us scratching our heads — especially in a case like this, where one might ask what this was really all about. It is hard to identify a winner here. But, it is certainly clear that if one were forced to identify a loser, it would be the taxpayers who have had to fund this litigation. Moreover, excessive judicial time and scarce judicial resources have been devoted to this case. Finality in this litigation is long overdue. The district court's decision is AFFIRMED.

**RONALD LEE GILMAN, Circuit Judge**, **concurring**. I agree with my colleagues that the district court's judgment in favor of Waste Management can be affirmed on the basis of that court's reconsideration of the Consent Decree and Settlement Agreement. Contrary to the lead opinion, however, I believe that the district court erred in holding that Waste Management's alternative theory of equitable estoppel was not also meritorious.

Ohio law recognizes equitable estoppel to prevent "a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good faith reliance upon that conduct." *Ohio ex rel. Cities Serv. Oil Co. v. Orteca*, 409 N.E.2d 1018, 1020-21 (Ohio 1980). To prevail on an equitable-estoppel theory, Waste Management must prove that the City of Dayton made a factual representation that (1) was misleading, (2) induced actual reliance that was reasonable and in good faith, and (3) caused a detriment to Waste Management. *See Walworth v. BP Oil Co.*, 678 N.E.2d 959, 963 (Ohio Ct. App. 1996). Courts in Ohio have held that equitable estoppel may be applied against a municipal corporation, such as Dayton, based upon the representations of its officers and agents. *See e.g., S.R. Prods. v. Gerrity*, 805 N.E.2d 104, 108 (Ohio Ct. App. 2004).

Contrary to the district court's decision and the analysis of the lead opinion, an examination of the record indicates that Waste Management did in fact detrimentally rely on the representations of Paul Woodie, Dayton's Director of Planning. No one disputes that Woodie sent a letter to Waste Management in March of 1994, stating that although Waste Management's plan to construct the buildings on the south side was a variation from the earlier site plan, the new location met the intent of, and was in substantial compliance with, PD-69. Waste Management then began working on the

buildings as soon as it received approval from the Ohio Environmental Protection Agency (Ohio EPA) in January of 1995. Robert Downing, Waste Management's Director of Operations at the landfill, testified that Waste Management expended more than six million dollars on design, engineering, and development of the buildings before Dayton issued its first objection to the location change in April of 1995.

Despite Waste Management's claim that it spent two million of those dollars *after* it began construction on the south side and *before* Dayton's first objection to the location, the district court held that "[Waste Management] has not indicated that [it] decided to proceed with the construction of the landfill at Stony Hollow in reliance upon Woodie's statement that the buildings could be located on the south side of the landfill." Downing testified, however, that he thought the relocation of the buildings was "approved" following Woodie's letter and that this approval seemed "very clear." Relying on this approval, Waste Management began construction immediately following approval by the Ohio EPA. The district court acknowledged Waste Management's actions and expenditures, but ultimately said that "decidedly missing . . . from the evidence presented by Waste Management is any indication that Waste Management would have done anything different, and thus, would have avoided those expenditures if Woodie had only said . . . that the buildings had to be constructed on the west side of the property."

I find the district court's evaluation puzzling in light of Downing's uncontradicted testimony that Waste Management began construction on the south side based on Woodie's approval. Although Waste Management might have incurred similar expenses—whether they be for design, engineering, or development—regardless of the building's location, it incurred two million dollars

in construction costs *after* it broke ground on the south side and *before* Dayton objected. Moreover, if Dayton's protests had prevented Waste Management from continuing to build on the south side, Waste Management would have incurred the *additional* expenses associated with rebuilding on the west side. These expenses, incurred as a direct result of Woodie's approval, seem to me clear proof of Waste Management's detrimental reliance.

The lead opinion, however, is skeptical that Waste Management reasonably relied on Woodie's letter in part because the setback, height, and slope requirements were still unresolved and would implicate the precise location of the buildings. *See* Maj. Op. at 23. Although those three unresolved issues may very well have implicated the "precise" location of the buildings, *id*., they would not have affected the placement of the buildings on the south, as opposed to the west, side of the property. A review of the record indicates that the expenses incurred following Woodie's letter were for construction tasks such as digging and clearing —tasks that would have been necessary on the south side regardless of the precise setback, height, and slope requirements. Because Waste Management reasonably believed that Woodie's letter established approval for the location of the buildings on the south side, it was justified in breaking ground at that location soon thereafter.

My colleagues further opine that even if Waste Management had relied on Woodie's letter, such reliance would not have been reasonable because Waste Management knew that the local zoning board was required to approve any modifications to PD-69. Maj. Op. at 23. This argument, however, fails to recognize the fact that Waste Management did not believe that a *modification* of PD-69, the Consent Decree, or any of the relevant agreements was necessary. In fact, the district

court held and this court affirms today that "no document expressly states where the buildings are to be located." Maj. Op. at 21. Given the ambiguity of the relevant documents, as well as Waste Management's steadfast contention that Woodie had approved the location of the buildings on the south side, I see no reason why Waste Management would think that it had to pursue other methods of approval of the south-side location.

My colleagues would also subject Waste Management to a higher burden than that usually required to prevail under an equitable-estoppel theory. *See* Maj. Op. at 24 ("[U]nlike ordinary cases in which estoppel arises, Waste Management must overcome *two* tiers of analysis—first, whether equitable estoppel is established, and second, whether the equitable considerations are sufficient to require modification of a consent decree.") (Emphasis added). Again, the analysis of my colleagues overlooks the fact that we are not considering an attempt by Waste Management to *modify* the consent decree. *See* Maj. Op. at 22 ("[W]e find no error in the district court's . . . ultimate conclusion that the agreements permit Waste Management to locate the buildings on the southern side of the landfill."). The question before us is one of *interpretation* rather than *modification* of the agreements, and because we have interpreted the agreements as permitting construction on the south side, no modification of the agreements was necessary. The lead opinion's requirement of an "elevated standard for modifying a consent decree" is therefore inapposite.

Because Waste Management has demonstrated that it relied to its detriment on Woodie's approval of the south-side location, I would affirm the judgment on the alternative ground of equitable estoppel in addition to the contractual-interpretation basis adopted by the lead opinion. In any event, I concur in the reasoning of the lead opinion on all other issues.