NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0621n.06

Case Nos. 18-3481/3482

**FILED**
Dec 14, 2018
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BRIAN K. HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| and | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| MICHAEL G. THOMPSON, | ) | OHIO |
| | ) | |
| Plaintiff-Appellee, | ) | **OPINION** |
| | ) | |
| v. | ) | |
| | ) | |
| EDGEWOOD PARTNERS INSURANCE | ) | |
| CENTER, INC., | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: COLE, Chief Judge; WHITE and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. This is the second appeal in a case about the scope of a non-solicitation agreement. The first time around, the district court enjoined Michael Thompson from soliciting clients in contravention of an agreement with his former employer, Edgewood Partners Insurance Center. Thompson appealed, and this court reversed, directing the district court to "modify the preliminary injunction to exclude clients that Thompson recruited and developed solely on his own." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017) ("*Hall I*"). The district court complied with these instructions. It held an evidentiary hearing and modified its injunction to exclude thirty-seven of Thompson's former clients. Edgewood then filed

this appeal, arguing that the district court applied the wrong legal standard in modifying the injunction.

But the district court applied exactly the standard this court told it to. Edgewood's argument is the same one rejected during the first appeal, and for that reason, we reject it again today. The district court's order modifying the preliminary injunction is therefore affirmed.

## I.

Michael Thompson sells insurance—or at least he did. He started in 1988, and about ten years later formed a company with his friend and fellow litigant, Brian Hall. The two worked for that company—Hylant Specialty Programs, or HSP—for about sixteen years. Then, in 2012, a company called USI Insurance Services purchased HSP.

As part of the acquisition, the companies executed an asset purchase agreement (the "APA"). The APA included two important features. First, USI required Hall, Thompson, and five other producers to execute employment agreements containing two-year non-solicitation clauses. Second, HSP agreed to sell its clients, client accounts, and associated goodwill to USI. Together, these two provisions presumably operated to transfer HSP's valuable book of business to USI and prevent HSP's employees from immediately soliciting those clients to a different firm after resigning.

But USI—perhaps unknowingly—had a problem. Thompson had a large list of clients at HSP, but he was only an employee and had no equity in the company. As a result, he did not participate in the sale of the company—he neither signed the APA nor received proceeds from the sale.

Edgewood disagrees with some of this narrative. It contends that Thompson sold HSP to USI, even though Thompson lacked any ownership interest in the company. In fact, Edgewood

goes so far as to say that "Thompson voluntarily sold his book of business to USI for valuable consideration." That argument apparently arises from the fact that USI conditioned its purchase on Thompson signing an employment contract (for which he received compensation) that included a restrictive covenant. But Thompson did not own HSP, and he was not a party to the APA. While USI surely viewed Thompson as a valuable part of the company—and thus necessary to the deal— its belief in his value did not transform Thompson from an employee into an owner. And nothing in the record suggests that he sold his book of business to USI.

 Things went south about four years after the USI acquisition when Edgewood entered the picture. Edgewood purchased USI, and as part of that transaction, USI transferred its assets— including its employment agreements with Hall and Thompson—to Edgewood. But Hall and Thompson could not agree on the terms of their continued employment, and both left the company in early 2017.

Almost immediately, Hall and Thompson started soliciting their former clients. They also sued for a declaratory judgment that their non-solicitation agreements are unenforceable. Edgewood responded with a countersuit and moved for a preliminary injunction. The district court granted that motion and enjoined Hall and Thompson from further solicitation. Both Hall and Thompson appealed.

In that first appeal the parties sparred over whether Edgewood could enforce the non-solicitation agreement against Thompson. Front and center of the debate was *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220 (N.Y. 1999), a New York[1] case governing the enforceability of restrictive covenants between employers and employees. *BDO Seidman* laid out a simple rule: an employer cannot prevent its employee from soliciting clients that the employee acquired on his

---

[1] Both parties agree New York law governs the enforceability of the agreement.

own. *Id*. at 1225. Those clients belong to the employee, so to speak, and employers have no legitimate interest in protecting such clients from competition. *Id*. Because Thompson acquired most of his clients without assistance from his employer, he argued, Edgewood cannot use the non-solicitation agreement to stop him from continuing to work with them. But Edgewood disagreed. *BDO Seidman* applies only to ordinary employment agreements, which—Edgewood argued—this is not. According to Edgewood, Thompson executed the agreement as part of a business sale. And in those circumstances, courts will generally enforce the restrictive covenant.

This court agreed with Thompson in *Hall I*. Citing *BDO Seidman*, we held that "Edgewood has no legitimate interest in barring Thompson from soliciting clients 'who came to [Hylant and USI] solely to avail themselves of [Thompson's] services and only as a result of his own independent recruitment efforts.'" *Hall I*, 878 F.3d at 529 (quoting *BDO Seidman*, 712 N.E.2d at 1225). The court then directed the district court to "make factual findings as to which of Thompson's clients he recruited and developed solely on his own accord, and which clients Hylant and USI expended their own resources on recruiting and developing." *Id*. at 529–30.

On remand, the district court held an evidentiary hearing. Thompson testified and produced evidence that he acquired thirty-seven of his former clients independently—that is, without financial assistance from either HSP or USI. Edgewood did not try to rebut that testimony with any evidence of its own. Instead, it focused on establishing that Thompson knowingly sold his interest in his former clients to USI. Thompson denied that he knew anything about the APA when he signed his employment agreement, and he denied that he sold anything to USI.

Edgewood then made the same argument as before: the non-solicitation clause is enforceable because this was a business sale, not an ordinary employment agreement. The district court rejected that argument—either implicitly on the merits or simply because our mandate

directed otherwise—and instead found that the thirty-seven clients identified by Thompson were exempt from the non-solicitation agreement because Thompson "recruited and developed [those clients] solely of his own accord." Edgewood then filed this appeal.

II.

Parties enter into restrictive covenants—like a non-solicitation agreement—primarily in two circumstances. Most commonly, an employee agrees to certain restrictions on his ability to compete after his employment. These kinds of agreements are "carefully scrutinized by the courts." *BDO Seidman*, 712 N.E.2d at 1222. But the second kind of agreement faces much less scrutiny. Those arise when a seller of a business agrees not to compete with the buyer. Courts will enforce these sale-of-business agreements without as much reservation. *See Purchasing Assocs., Inc. v. Weitz*, 196 N.E.2d 245, 247 (N.Y. 1963).

For ordinary employment agreements, the employer must show that a restrictive covenant is "reasonable"—a term of art that categorically excludes some restrictions. *BDO Seidman,* 712 N.E.2d at 1223 (citing *Technical Aid Corp. v. Allen*, 591 A.2d 262, 265–66 (N.H. 1991)). *BDO Seidman* articulated one such exclusion. There, the court held that an employer cannot prevent its former employee from soliciting clients that the employee acquired or developed independently. *Id.* at 1225. The rule protects an employee, like Thompson, who joins a company and brings along his own book of business.

But *BDO Seidman* does not apply to the second class of cases in which we find restrictive covenants. "Where . . . there is a sale of a business, involving . . . the transfer of its good will as a going concern, the courts will enforce an incidental covenant by the seller not to compete with the buyer after the sale." *Purchasing Assocs.* 196 N.E.2d at 247. This rule protects the integrity of the transaction. A buyer has no incentive to purchase the client goodwill of a business if it cannot

restrict the seller from soliciting those clients after the sale closes. So where the restrictive covenant is bargained for as part of an asset sale—rather than an employment agreement—the courts will typically enforce it.

Edgewood and Thompson disagree over what kind of non-solicitation agreement this is. Was it part of an ordinary employment agreement or a business sale? Fortunately, our task here is easy because the court answered that question during the first appeal. Relying on *BDO Seidman*, *Hall I* held that "Edgewood has no legitimate interest in barring Thompson from soliciting clients 'who came to [Hylant and USI] solely to avail themselves of [Thompson's] services and only as a result of his own independent recruitment efforts.'" *Hall I*, 878 F.3d at 529 (quoting *BDO Seidman*, 712 N.E.2d at 1225). The decision, in other words, implicitly treated the non-solicitation agreement as part of an ordinary employment contract. And because of that, the court explained, Edgewood cannot enforce it with respect to clients Thompson acquired on his own. *Id.*

Parties cannot typically relitigate issues resolved by the court at a prior stage of the litigation. *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994). Under the law-of-the-case doctrine, "findings made at one point in the litigation become the law of the case for subsequent stages of the same litigation." *Id*. The rule restrains courts from reconsidering issues already decided, *Keith v. Bobby*, 618 F.3d 594, 599 (6th Cir. 2010), and it applies to "the trial court before an appeal, after the case has been remanded to the trial court by an appellate court, or in a later appeal." Bryan A. Garner, et al., *The Law of Judicial Precedent* 441 (2016). S*ee also Caldwell v. City of Louisville*, 200 F. App'x 430, 432–33 (6th Cir. 2006).

Courts can establish the law of the case either explicitly or implicitly. *Keith*, 618 F.3d at 599; *In re Purdy*, 870 F.3d 436, 442–43 (6th Cir. 2017). There is no precise formula for determining whether a court resolved an issue implicitly, but the inquiry generally turns on whether

"resolution of the issue was a necessary step in resolving the earlier appeal." *See In re Purdy*, 870 F.3d at 443 (quoting *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 169 F. App'x 976, 986 (6th Cir. 2006)). Other examples of an implicit decision arise when "resolution of the issue would abrogate the prior decision" or when "the issue is so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated." *Id*. (quoting *Waste Mgmt. of Ohio*, 169 F. App'x at 986). Generally, though, the question is simply whether the first decision "necessarily indicated" that the court decided the issue. *See Keith*, 618 F.3d at 600.

This court's prior decision leaves no doubt on whether it resolved this issue during the first appeal. *Hall I* adopted the standard from *BDO Seidman* after extensive briefing from both parties on the issue and directed the district court to determine which clients fall under that case. Because *BDO Seidman* applies only to ordinary employment contracts and does not affect agreements executed as part of the sale of a business, the decision implicitly rejected Edgewood's contrary theory. *Hall I* held that *BDO Seidman* controls, which means that the non-solicitation agreement does not fall within New York's sale-of-business standard.

A counterfactual illustrates this point well. The court could have remanded this case to the district court to make factual findings about whether Thompson sold any client goodwill to USI. That kind of mandate would leave open the possibility that Edgewood's sale-of-business argument could still carry the day. And in fact, Edgewood erroneously suggests that the *Hall I* opinion did just that. But the decision was much narrower. The court ordered the district court to apply *BDO Seidman*, and it left no room for it to do anything else.

Of course, the law-of-the-case doctrine is not without exception. This court has recognized "three exceptional circumstances under which [we] will reconsider a previously decided issue: (1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent

contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *United States v. Rayborn*, 495 F.3d 328, 337 (6th Cir. 2007) (citations and internal quotation marks omitted). But none of these exceptions fit the circumstances here. This is not a case in which the parties raised substantially different evidence. In fact, the evidence elicited at the evidentiary hearing on remand—that Thompson was not an owner of HSP and did not know about the APA—supports the prior decision. And Edgewood has not identified a contrary controlling authority that was decided after our first decision. Finally, we have no reason to believe that the decision to apply *BDO Seidman* to Thompson's employment contract was clearly erroneous or that implementing the original decision would work a manifest injustice.

Because of that, the law of the case bars Edgewood's argument that the court applied the wrong legal standard.[2] We therefore affirm the district court's decision exempting thirty-seven clients from the preliminary injunction.[3]

---

[2] Although Thompson argues that we already rejected Edgewood's argument on the first appeal, he does not explicitly contend that Edgewood's argument is barred by the law-of-the-case doctrine. Nevertheless, we may raise the doctrine sua sponte. *See United States v. Wallace*, 573 F.3d 82, 90 n.6 (1st Cir. 2009) (reserving the right to "raise the law of the case issue sua sponte if [the court] deem[s] it appropriate"); 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters § 4478 (2d ed. 2002) ("[T]he purposes to conserve judicial resources and to preserve the integrity of judicial processes means that a court may raise the law of the case on its own."); *see also Arizona v. California*, 530 U.S. 392, 412 (2000) ("[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte*, even though the defense has not been raised." (citations and internal quotation marks omitted)).

[3] Our decision today should not be construed as altering the otherwise interlocutory nature of the preliminary injunction. The law-of-the-case doctrine does not prevent Edgewood or Thompson from raising similar arguments down the road. *See William G. Wilcox, D.O., P.C. Employees' Defined Benefit Pension Trust v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989). New facts uncovered during discovery might alter the analysis, or the controlling law might shift. But those issues are for another day. Edgewood's appeal centers on the same preliminary injunction we

III.

Finally, we decline Thompson's request to sanction Edgewood or award him his costs and fees for this appeal. Although we agree that the court already rejected Edgewood's argument, we do not find that Edgewood brought this appeal with "no reasonable expectation" of prevailing. *Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 677 (6th Cir. 1999). The court's first decision adopted *BDO Seidman* without expressly rejecting Edgewood's contrary theory. The implicit nature of our decision does not diminish its impact, but it does weigh against sanctioning Edgewood for this second appeal.

\* \* \*

For the above-stated reasons, we **AFFIRM**.

---

analyzed before, and our prior decision constitutes the law of the case for this particular issue. *See* Garner, *supra*, at 441.